## SUMMARY OF ARGUMENT

This Court repeatedly has held that "[e]quitable considerations" and a court's own "notions of abstract justice or moral obligation" play no part in the interpretation of insurance policy language. *See, e.g., Breed v. Insurance Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978). If policy language is clear and its enforcement would not be unconscionable or illegal, it must be enforced. These basic propositions, so often urged by insurers in opposition to policyholders' claims more persuasively founded in equity than in policy language, apply with no less force where those roles are reversed. Indeed, because the *contra proferentum* canon requires a court to resolve an ambiguity in an insurance policy against the insurer who drafted the ambiguous language, these propositions apply *a fortiori* where it is the insurer that seeks refuge in equity.

In *Olin Corp. v. Insurance Corp. of N. Am.*, 221 F.3d 307 (2d Cir. 2000), the only authority relied upon by the First Department for its holding that the scope of the duty to indemnify under Con Edison's policies is pro rata rather than indivisible, the Second Circuit made no attempt to apply established New York law governing insurance policy interpretation. The court's holding that the policy language was "inconclusive," *id.* at 324, was incorrect even on its own terms. The court then compounded that error by "turn[ing] to public policy and equitable considerations," *id.*, which this Court's precedents specifically proscribe, rather than applying *contra proferentum* as this Court's precedents require. No New York authority supports this approach, and the Second Circuit tellingly cited none. The authority that the Second Circuit did invoke -- the New Jersey Supreme Court's decision in *Owens-Illinois, Inc. v. United Ins. Co.*, 138 N.J. 437,

650 A.2d 974 (1994), and its own decisions adopting *Owens-Illinois* -- embodies a frankly legislative approach that cannot be reconciled with this Court's precedents.

Under New York law, the language of Con Edison's policies is decisive. If an event causes damage during the policy period, the policy is triggered. Once triggered, the policy must indemnify Con Edison, up to policy limits, for "all sums" incurred as a consequence of that event -- not merely "all sums" incurred during the policy period. Con Edison's insurers' contentions to the contrary do violence to the language of the policies that they drafted. This Court should enforce the policies as written.

Even if this Court were to hold that the policy language is ambiguous, reversal still would be required. Respondents have offered no extrinsic evidence to support their interpretation, so even if their interpretation were "consistent" with the policy language, *see Olin*, 221 F.3d at 323-24, the *contra proferentum* canon would require adopting Con Edison's interpretation.

Finally, this case should present no temptation to put aside the ordinary rules governing policy interpretation in favor of "raw equity" or the Court's own notions of good public policy. The experience of Abex and similarly-situated policyholders demonstrates that a regime of truncating the insurer's "all sums" indemnity obligation to a pro rata share is unfair and inefficient. It would be a mistake to adopt such a regime even if policy language and precedent afforded the Court discretion to do so. On the other hand, enforcing the insurers' indivisible indemnity obligations to Con Edison under the contracts of insurance at issue would not affect the insurers' rights, after making Con Edison whole, to seek an allocation of indemnity payments among themselves in equity.

ARGUMENT

I.   **THE PLAIN LANGUAGE OF THE POLICIES REQUIRES EACH TRIGGERED POLICY TO INDEMNIFY CON EDISON FOR ALL SUMS PAID AS A RESULT OF THE TRIGGERING EVENT**

   A.   **This Court's Precedents Make Clear That A Court Has No Discretion To Depart From The Plain Meaning Of A Policy Because Of Perceived Considerations Of Equity Or Efficiency**

When a court is called upon to interpret an insurance policy or other contract, the first question for the court is whether the contract has a plain meaning. *See, e.g., W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162 (1990); *Breed v. Insurance Co. of N. Am.,* 46 N.Y.2d 351, 355 (1978). If an insurance policy is unambiguous, its terms "must be accorded their plain and ordinary meaning and the policy enforced as written." *Francis v. INA Life Ins. Co. of N.Y.,* 809 F.2d 183, 185 (2d Cir. 1987). This Court repeatedly has applied the "eminently sensible proposition of law" that a "clear, complete . . . writing should as a rule be enforced according to its terms." *W.W.W. Assocs., Inc.,* 77 N.Y.2d at 162; *accord Wallace v. 600 Partners Co.,* 86 N.Y.2d 543, 548 (1995). The only exceptions to the rule that unambiguous contracts must be enforced according to their terms are that a contract's "terms may not be unconscionable or violative of a supervening public policy," *Uribe v. Merchants Bank of New York,* 91 N.Y.2d 336, 341 (1998), or be "unenforceable" as written or "create an absurd result," *Wallace,* 86 N.Y.2d at 548.

In particular, this Court has emphasized that a court lacks authority to "make or vary [a] contract of insurance to accomplish its notions of abstract justice or moral obligation." *Breed,* 46 N.Y.2d at 355; *accord, e.g., Teichman v. Community Hosp. of*

9

*Western Suffolk*, 87 N.Y.2d 514, 520 (1996). "'[E]quitable considerations will not allow an extension of the coverage [provided by an unambiguous policy] beyond its fair intent and meaning in order to do raw equity . . . .'" *Breed*, 46 N.Y.2d at 355 (quoting *Weinberg & Holman v. Providence Washington Ins. Co.*, 254 N.Y. 387, 391 (1930)). A "cardinal rule[ ] of universal application" is that "when the language is clear and unequivocal, the contract should be enforced according to its terms, without regard to the equitable considerations which may be urged in avoidance of it." *Janneck v. Metropolitan Life Ins. Co.*, 162 N.Y. 574, 576 (1900). "'[I]t is not the function of the judiciary to change the obligations of a contract which the parties have seen fit to make,'" even if the contract's terms are "novel or unconventional." *Wallace*, 86 N.Y.2d at 548 (quoting 4 Williston, *Contracts* § 610A, at 513 (3d ed.)); *accord, e.g., Francis*, 809 F.2d at 185 ("it is not the function of a court to rewrite insurance policies so as to provide coverage which the court might have considered more equitable") (quotation omitted). Nor may a court "subvert[ ]" an unambiguous contract by "straining to find an ambiguity." *Uribe*, 91 N.Y.2d at 341. What this Court held nearly a century ago remains unassailable today:

> Doubtless the justice of the provision would be a subject for debate and disagreement between the parties to the contract. . . . . But these considerations on one side or the other are not before us in this case. If the parties to a contract adopt a provision which contravenes no principle of public policy and contains no element of ambiguity the courts have no right to relieve one of them from disadvantageous terms which he has actually made, by a process of interpretation.

*Rosenthal v. American Bonding Co. of Baltimore*, 207 N.Y. 162, 168 (1912).

Because the legislature has given the courts no authority to rewrite unambiguous contracts in the service of the courts' own notions of fairness or efficiency, a court's role is not to decide whether the scope of an insurer's duty to indemnify "should" always, sometimes, or never be indivisible, but rather to decide whether the terms of the policy before the court render it so. A court's role is not to decide whether an allocated, partial duty to indemnify is in the best interests of society, but rather to decide whether the terms of the contract of insurance before the court require, permit, or forbid such a partial duty. In short, when a court is confronted with a contract that has a plain meaning, the court's perceptions of equity and efficiency are irrelevant.[4]

**B.    The Plain Language Of The Policies Forecloses Respondents' Request To Pay Only A Pro Rata Allocated Share To Con Edison**

With immaterial variation, the policies at issue in the present case provide that the insurer will pay "all sums" that Con Edison is obligated to pay "for damages, direct or consequential, and expenses, all as more fully defined by the term ultimate net loss, on account of personal injuries, including death at any time resulting therefrom, and property damage, caused by or resulting out of each occurrence." A-179. "Ultimate Net Loss" is defined as "the total sum which the Insured, or any company as his insurer, becomes

---

[4] This State is hardly alone in requiring courts to enforce contracts as written. *See, e.g., Leverso v. Southtrust Bank of Al., N.A.*, 18 F.3d 1527, 1534 (11th Cir. 1994) ("Although the district court's rationale seems intuitively equitable, under universal contract principles judicial equitable notions cannot override unambiguous contractual rights.") (applying Florida law); *Rhone-Poulenc Basic Chem. Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195-96 (Del. 1992) ("When the language of an insurance contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented.") (quotation omitted).

obligated to pay . . . as a consequence of any occurrence covered hereunder . . . ." A-181. And "Occurrence" is defined as "an event, or continuous or repeated exposure to conditions, which causes injury, damage or destruction during the policy period. All such exposure to or events resulting from substantially the same general conditions during the policy period shall be deemed one occurrence." A-180. Finally, the policies provide that they "appl[y] only to 'occurrences' as defined herein, happening during the policy period." A-180.[5]

Integrating this language, the policies provide that the insurer shall pay Con Edison "all sums" that Con Edison is obligated to pay "on account of . . . damage" caused by "an event . . . which causes injury . . . during the policy period," so long as such "event" "happen[s] during the policy period." Under this language, the policy is triggered if Con Edison becomes obligated to pay as a result of a covered event "which causes injury . . . during the policy period." If Con Edison becomes obligated to pay as a result of an event that causes injury during the policy periods of multiple policies, each such policy is triggered. Once a policy is triggered, the duty to indemnify is measured by the "all sums" provision. If an event "causes . . . injury during the policy period" of a given policy, that event constitutes an "occurrence," and the policy must pay "all sums" that Con Edison becomes obligated to pay "as a consequence of [that] occurrence," up to policy limits.

---

[5] The policies quoted in the text are those of respondent Travelers Indemnity Company. *See* Travelers 1st Dept. Br. at 6-7. Respondents have not contended that any material difference in policy language exists. *See* Con Ed. Br. at 4 n.3.

Respondents argued below that under this policy language, each triggered policy is liable only for the portion of the injury that occurred during its policy period. From their statements of the questions presented through their legal argument, respondents' briefs were littered with incorrect and misleading assertions that truncated, transposed, or simply ignored the controlling policy language. For example, the London Market Insurers told the First Department that "in accordance with the language, any triggered policy pays only for that damage that takes place during that policy period." London Market Insurers 1st Dept. Br. at 13. Travelers similarly asserted that each policy makes the insurer responsible "for 'all sums' incurred 'during the policy period.'" Travelers 1st Dept. Br. at 14.

These assertions do violence to the language of the policies.

- The policies do state that they pay only *if* damage takes place during the policy period. But they do *not* state that they "pay[ ] only for that damage that takes place during that policy period," London Market Insurers 1st Dept. Br. at 13.

- The policies do state that the insurer is responsible for all sums incurred as a result of an event that causes injury during the policy period. But they do *not* state that the insurer is responsible "for 'all sums' incurred 'during the policy period,'" Travelers 1st Dept. Br. at 14.

- The policies do state that they provide coverage only *if* damages occur during the policy period. But they do *not* state that they "provide coverage only for damages occurring 'during the policy period,'" Travelers 1st Dept. Br. at 1, or only for "loss occurring 'during the policy period,'" *id.* at 3.

- The policies do state that coverage is triggered only if damage occurs during that particular policy's period. But they do *not* state (or "indicate," in respondent's tellingly half-hearted phrasing) that coverage "extends only to damage during that particular policy's period," London Market Insurers 1st Dept. Br. at 14.

13

Contrary to respondents' efforts to transform the triggering requirement that damage occur during the policy period into a limitation of coverage to the portion of the damage that occurs during the policy period, the policies unambiguously provide that the insurer must pay "all sums" that Con Edison is obligated to pay as a result of an event that causes damage during the policy period. An event that causes some damage during the policy period constitutes an "occurrence" that triggers the policy. Each triggered policy has an indivisible and several obligation to pay "all sums" that Con Edison is obligated to pay as a consequence of that "occurrence," subject to policy limits. Nothing in the language of these policies permits the conclusion that a triggered policy owes Con Edison only a pro rata portion of the indemnity obligation arising out of a covered occurrence.

To be sure, respondents could have drafted and sold more restrictive policies had they chosen to do so. *See, e.g., Janneck,* 162 N.Y. at 577 ("we do not deny the right of an insurance company to make just such a contract as the defendant claims to have made in the present case"). Of course, to the extent that respondents' hypothetical policies would have provided less coverage, respondents would have been forced to charge less for them. Nonetheless, had respondents deemed it desirable, they could have made damage during the policy period not merely the trigger for coverage, but also the *measure* of coverage. *Cf. Hercules, Inc. v. AIU Ins. Co.,* 784 A.2d 481, 491 n.28 (Del. 2001) ("The policies could have contained proration provisions but did not."); *York-Buffalo Motor Express, Inc. v. National Fire & Marine Ins. Co.,* 294 N.Y. 467, 473 (1945) ("In the absence of such a [pro rata] clause, the insured could recover the whole amount from any

14

one of the insurers, and leave him to obtain contribution from the other insurers.")
(quotation omitted).

But rather than draft policies that limited coverage to the damage caused during
the policy period, respondents drafted and sold policies that covered "all sums" arising
out of an event, provided that the event caused *some* damage during the policy period.
This Court has recognized that it lacks authority to "rewrite the bargain that was struck."
*W.W.W. Assocs., Inc.,* 77 N.Y.2d at 163; *see also, e.g., Breed,* 46 N.Y.2d at 355 ("This
court may not make or vary the contract of insurance . . . 'in order to do raw equity and to
obviate objections which might have been guarded against.'") (quoting *Weinberg &
Holman,* 254 N.Y. at 391); *Wallace v. 600 Partners Co.,* 205 A.D.2d 202, 206 (1st Dept.
1994) ("Courts should not, under the guise of interpretation, rewrite part of an agreement
which is clear and explicit simply because a party's expectation of the bargain does not
materialize . . . ."), *aff'd,* 86 N.Y.2d 543 (1995); *John Hancock Mut. Life Ins. Co. v.
Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir. 1994) ("The court was not obligated to
bail Amerford out of a contract it entered into willingly just because Amerford is now
unhappy with that contract.") (applying New York law).

Under the plain language of the policies at issue in this case, Con Edison has the
right to require each triggered policy to honor its promise to pay "all sums" arising out of
the covered event, up to policy limits.  The lower courts contravened the plain language
of the policies when they concluded that the duty to indemnify under each policy, rather
than being indivisible and covering "all sums" that Con Edison was obligated to pay as a
consequence of a covered occurrence, was limited to a pro rata share of such sums.

**II.** **THE INTERPRETATION OF AN INSURANCE POLICY IS A LEGAL QUESTION GOVERNED BY WELL-ESTABLISHED STANDARDS, NOT A DISCRETIONARY MATTER COMMITTED TO THE JUDGMENT OF THE COURT BASED ON ITS OWN VIEW OF PUBLIC POLICY**

> **A.** **Under This Court's Precedents, Insurance Policy Interpretation Is Governed By A Well-Defined Legal Analysis In Which Equity And Public Policy Have No Role**

This Court's precedents establish a well-defined, multi-step analysis for questions of insurance policy interpretation. First, the court must ask whether the language of the policy is unambiguous. *See, e.g., W.W.W. Assocs., Inc.*, 77 N.Y.2d at 162-63. "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Id.* At this step, the court must not "strain[ ] to find an ambiguity," but rather must respect a contract's "plain and clear" meaning. *Uribe*, 91 N.Y.2d at 341 (quotation omitted). If a contract is unambiguous, the court's task is at an end; extrinsic evidence is not admissible to vary the terms of an unambiguous contract. *See, e.g., W.W.W. Assocs., Inc.*, 77 N.Y.2d at 162-63 (holding that "the extrinsic evidence tendered by plaintiff is not material," because the contract was unambiguous).

If the policy is susceptible of more than one reasonable interpretation, the court proceeds to the second step. To aid in interpreting an ambiguous policy, "the parties may submit extrinsic evidence" to attempt to establish their actual intent. *State of New York v. Home Indem. Co.*, 66 N.Y.2d 669, 671 (1985). If the extrinsic evidence favors either the insurer's or the policyholder's interpretation so powerfully that no genuine issue of fact exists, the court may resolve the issue on summary judgment. *See, e.g., Scholastic, Inc. v. Harris*, 259 F.3d 73, 83 (2d Cir. 2001). If the extrinsic evidence creates a genuine

16

issue of fact, "the resolution of the ambiguity is for the trier of fact." *Home Indem. Co.,*

66 N.Y.2d at 671.[6]

    If no extrinsic evidence is offered, or if purported extrinsic evidence fails to

"supply the evidentiary facts needed to present an issue for the jury," then the court

moves to the third step. *Home Indem. Co.,* 66 N.Y.2d at 672. At this stage, with the

insurer and the policyholder each advocating an interpretation that is reasonable in light

of the policy language, and in the absence of extrinsic evidence sufficient to create a

triable issue as to the parties' actual intent, "the interpretation of the insurance policy is

an issue of law" for the court. *Id.* The court resolves the ambiguity as a matter of law by

applying the *contra proferentum* canon and adopting the interpretation favorable to the

policyholder. *See, e.g., id.* ("the ambiguity must be resolved against the defendant

insurer which drafted the contract").

    In this framework, an interpretation favorable to the insurer on a disputed question

cannot be adopted unless (1) it is the only reasonable interpretation of the policy language

(*i.e.,* the policy is unambiguous); (2) extrinsic evidence demonstrates so powerfully that

---

[6] Some authority holds, in contrast, that to prevent application of *contra proferentum* an insurer must present extrinsic evidence that *conclusively* resolves the ambiguity. *See, e.g., Kenavan v. Empire Blue Cross and Blue Shield,* 248 A.D.2d 42, 47 (1st Dept. 1998) ("Since evidence introduced by the parties extrinsic to the policies was not dispositive of the issue, the IAS Court also properly relied on the doctrine of *contra preferentum* . . . ."); *cf. Morgan Stanley Group Inc. v. New England Ins. Co.,* 225 F.3d 270, 280 (2d Cir. 2000) ("Therefore, if on remand the extrinsic evidence sheds no light on the . . . ambiguity or 'does not yield a conclusive answer,' the district court should apply contra proferentem.") (citation omitted). Because the insurers in the present case offered no extrinsic evidence at all, this Court need not decide whether an insurer may avoid application of *contra proferentum* by presenting extrinsic evidence that would permit, but not require, a reasonable fact-finder to find that the parties intended the insurer's interpretation.

the parties intended the insurer's interpretation that no reasonable jury could find

otherwise; or (3) extrinsic evidence permits the jury to find that the parties intended the

insurer's interpretation.  If none of these conditions obtains -- if the policy is ambiguous

and extrinsic evidence neither compels the insurer's interpretation nor creates a triable

issue as to the parties' intent -- then the court applies *contra proferentum* and the

policyholder's interpretation prevails as a matter of law.  *See, e.g., Westview Assocs. v.

Guaranty Nat'l Ins. Co.,* 95 N.Y.2d 334, 340 (2000) ("It is at least ambiguous as to

whether lead paint claims are excluded pursuant to the umbrella policy's pollution

exclusion.  That ambiguity in the policy must be construed against the insurer.").

Well-established law governs at each step of this process.  At no point is the court

free to consult its own notions of what is fair or unfair, wise or unwise, and to exercise its

discretion as to how best to balance the interests of the parties and of society as a whole

under the particular circumstances of the case at hand.  A court has no discretion, for

example, to hear extrinsic evidence if the policy language is unambiguous.  *See W.W.W.

Assocs., Inc.,* 77 N.Y.2d at 162-63.  A court likewise has no discretion to apply *contra

proferentum* if extrinsic evidence conclusively resolves the ambiguity in favor of the

insurer.  And, a court has no discretion to *decline* to apply *contra proferentum* if the

insurer offers no extrinsic evidence or none sufficient to create a jury issue.[7]  Nothing in

New York law confers any such discretion upon a court called upon to interpret a

---

[7] As noted, in the present case, respondents offered no extrinsic evidence.  Because it is the insurer's burden to present extrinsic evidence in order to avoid the application of *contra proferentum*, Con Edison was not obligated to present extrinsic evidence.  Nonetheless, Con Edison did present extrinsic evidence that supported its interpretation.  *See* Con Ed. Br. at 4-5.

18

contract. To the contrary, this Court's decisions discussed above make clear that a court's "notions of abstract justice or moral obligation" have no place in the interpretation of insurance policies.

**B.    *Olin* Substituted A Free-Form Discretionary Inquiry In Place Of The Legal Analysis Required By This Court's Precedents**

The First Department cited no decision of this Court as authority for its conclusion that "the damage should be pro rated over the 50-year period plaintiff claimed it continuously occurred, and not allocated to any one specific year that plaintiff might elect." Con Edison Br. at BA-5. In agreeing with respondents on this issue, the First Department cited only *Olin Corp. v. Insurance Co. of N. Am.*, 221 F.3d 307 (2d Cir. 2000). Similarly, in Abex's case, the district court has relied upon *Olin* as stating New York law in the absence of a decision of this Court interpreting the language contained in Abex's policies. *See Abex Corp.*, Slip Op. at 19-25 (D.D.C. Nov. 6, 2001). *Olin,* however, cannot be reconciled with this Court's precedents, and this Court should reject its approach and its result.[8]

*Olin* and the other decisions that have declared a pro rata allocated duty to indemnify under policies similar to those at issue in this case have not purported to hold that the policy language compels such a partial duty and forecloses a complete and indivisible duty to indemnify. Nor have these courts found that the policy language is

---

[8] In the event that this Court decides to adopt *Olin*'s holding that the scope of the duty to indemnify is pro rata, this Court should adopt *Olin*'s corollary holding that indemnity costs may be "allocated" to the policyholder only for periods of time when the policyholder could have purchased insurance for the risk, but chose not to do so. *See Olin*, 221 F.3d at 325.

ambiguous but that extrinsic evidence shows that the parties intended to provide for a

partial duty rather than for a complete and indivisible duty to indemnify. Nor, of course,

has any court stated that a pro rata duty should be adopted by inverting the normal rule of

*contra proferantum* in order to interpret ambiguous policy language in favor of the

insurer who drafted the policy. In fact, the courts that have declared a pro rata duty and

rejected the indivisible duty to indemnify have not followed the well-established, multi-

step legal analysis for insurance policy interpretation under this Court's precedents at all.

The most that any court has been able to say about a pro rata allocated duty to

indemnify is that it is "consistent" with policy language. *See Olin*, 221 F.3d at 323

("While the policies' language on the scope of liability once triggered is not free from

ambiguity, we do find it consistent with allocation."). With respect to policies worded

similarly to those at issue here, this is incorrect even on its own terms. The court

recognized that Olin had policies that required the insurer to pay "'all sums' that Olin

'become[s] obligated to pay by reason of the liability imposed upon [it] . . . for damages

because of injury to . . . property . . . caused by accident' provided 'the accident[ ]

happene[ed] *during the policy period*.'" *Id.* at 323-24 (alterations and emphasis in

original). Under this language, as under Con Edison's policies, once an accident causes

damage during the policy period, the policy is triggered and must pay "all sums" caused

by the accident -- not merely "all sums" caused during the policy period.

More fundamentally, however, this Court's precedents make it crystal clear that an

insurer's interpretation of an ambiguous policy is not adopted unless it is the *only*

reasonable interpretation of the policy language; if the policyholder and the insurer both

offer interpretations that are "consistent" with the policy language and extrinsic evidence does not resolve the dispute, then the policyholder's interpretation prevails under *contra proferentum. See supra* at 17-18; *see also Hercules, Inc. v. AIU Ins. Co.,* 784 A.2d 481, 491 n.30 (Del. 2001) ("[The insurers] argue merely that pro rata allocation is 'consistent' with the 'all sums' policy language. . . . [This argument] fails because this amounts to a tacit argument that the policy language is ambiguous. Under the doctrine of *contra preferentum* the ambiguity would be construed against the insurers."). Accordingly, even if *Olin*'s premise that the policies could be read to provide for a pro rata allocated duty to indemnify were correct, *Olin*'s conclusion would not follow under New York law.

Rather than adhere to this Court's longstanding approach to policy interpretation, however, *Olin* created a new approach. The *Olin* court said: "Because the language is inconclusive . . . we turn to public policy and equitable considerations." 221 F.3d at 324.[9] Under this Court's precedents, the court should have turned to extrinsic evidence, not to "its notions of abstract justice or moral obligation." *Breed,* 46 N.Y.2d at 355. If (as in the present case) the insurers offered no extrinsic evidence, then the court should have turned to the *contra proferentum* canon.

*Olin*'s wide-ranging examination of fairness and efficiency, utterly divorced from the policy language, demonstrates that the court thought itself empowered to decide what indemnity regime it preferred. The court opted for a pro rata allocated duty to indemnify in *Olin* in part because it believed that "[i]n the context of this litigation . . . allocation

---

[9] In reality, the *Olin* court indulged in an extended discussion of public policy and equitable considerations before it even examined the policy language. *See id.* at 322-23.

serves the cause of efficiency." *Id.* at 324. At the same time, the court stated that what it described as the "joint and several approach,"[10] as opposed to pro rata allocation, "may be appropriate" under other circumstances. *Id.* at 323. And the court's conclusion merely upheld pro rata allocation as the proper approach "[o]n balance, under these circumstances." *Id.* at 324. In treating the interpretation of the policies' indemnity provisions as a discretionary matter to be resolved on a case-by-case basis, not according to the policy language, but according to the court's view of the equities and public policy in the case at bar, the Second Circuit committed a fundamental error.

*Olin* relied upon two earlier Second Circuit decisions, *In re Prudential Lines Inc.,* 158 F.3d 65 (2d Cir. 1998), and *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.,* 73 F.3d 1178 (2d Cir. 1995), *modified,* 85 F.3d 49 (2d Cir. 1996). Although *Prudential* reached the correct result, neither *Prudential* nor *Stonewall* employed the analysis dictated by this Court's precedents. In *Prudential,* the court framed the question as "whether each policy is liable for the entirety of each claim or whether each policy is responsible for paying only the portion of the claim somehow attributable to the amount of injury during the policy period." 158 F.3d at 84. The court correctly recognized that "[t]he answer is, it depends." *Id.* But instead of recognizing that what the answer "depends" on is the actual language of the contract of insurance before the court, the Second Circuit suggested that it depended on considerations of equity, efficiency, and

---

[10] The theory of "joint and several" liability is one of tort law, not contract law. There is nothing "joint" about the obligations of multiple insurers to their insureds under their respective bilateral contracts.

public policy. Indeed, the court candidly observed that the courts that have opted for a

pro rata allocated duty to indemnify "have generally been motivated by considerations of

equity and policy, rather than contract wording." *Id.* at 85.

The *Prudential* court acknowledged "the policy's broad language covering 'any

loss [or] damage' which Prudential becomes liable to pay resulting -- *presumably even in

part* -- from injuries occurring during the policy period." *Id.* at 86 (brackets in original;

emphasis added). And the court acknowledged "the absence of a contractual intent to

require allocation of liability among policies in the first instance." *Id.* Under this Court's

precedents, that should have been the end of the matter -- the policyholder's

interpretation of the duty to indemnify as indivisible should have prevailed as a matter of

law. *Cf. Hercules, Inc.*, 784 A.2d at 494 (emphasizing that although its holding that the

duty to indemnify was indivisible was not inequitable, "our holding rests solely on . . . the

unambiguous 'all sums' provision"). Although the *Prudential* court ultimately adopted

the policyholder's interpretation, the court suggested that its decision depended on "the

lack of any compelling policy or equitable considerations favoring allocation." 158 F.3d

at 86.

In *Stonewall*, the Second Circuit openly embraced notions of public policy as the

basis for its decision. Like Con Edison's and Abex's policies, the policies at issue in

*Stonewall* required the insurer to pay "all sums" that the policyholder became obligated

to pay because of an "accident, or a continuous or repeated exposure to conditions which

results, during the policy period, in personal injury . . . ." 73 F.3d at 1187. The court

acknowledged that, under this policy language, for an asbestos-related bodily injury

23

claim involving personal injury occurring during multiple policy periods, "there may be several policies each independently responsible under their explicit terms for paying 'all sums' that [the policyholder] becomes liable to pay to the claimant." *Id.* at 1201. Again, under this Court's precedents, these "explicit terms" should have been the end of the matter. Even if the court thought these terms ambiguous, *compare id.* at 1203 (suggesting that the policies "do not squarely resolve the allocation issue"), the policyholder's interpretation should have prevailed as a matter of law, because the insurer offered no extrinsic evidence. But the Second Circuit did not follow the analytical framework established by this Court's precedents.[11] Instead, the court adopted as the law of New York the decision of the New Jersey Supreme Court in *Owens-Illinois, Inc. v. United Ins. Co.*, 138 N.J. 437, 650 A.2d 974 (1994). *See Stonewall*, 73 F.3d at 1203 ("We agree with the analysis of the New Jersey Supreme Court and think it likely that New York . . . will also agree.").

Although *Owens-Illinois* represents the fountainhead of the Second Circuit's approach to the duty to indemnify under New York law, even a cursory review of *Owens-Illinois* demonstrates that it cannot be reconciled with this Court's precedents governing

---

[11] The Second Circuit has reiterated since *Olin* that its allocation decisions have not been based on the terms of the policies at issue. *See E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*, 241 F.3d 154, 172 (2d Cir. 2001) (per curiam) (acknowledging "the fact that a strict reading of the policies would render 'each [insurer] independently responsible under their [policies'] explicit terms for paying 'all sums' [for which the insured] becomes liable,'" but stating that "[n]onetheless, the *pro rata* method can be justified 'by considerations of equity and policy, rather than contract wording'") (quoting *Stonewall*, 73 F.3d at 1201, and *Prudential*, 158 F.3d at 85) (alterations in original); *see also E.R. Squibb & Sons, Inc.*, 241 F.3d at 183 (Jacobs, J., dissenting in part) ("This Court has recently held that allocation among multiple triggered policies is appropriate under New York law because it is consistent with policy concerns . . . and serves the cause of efficiency.") (citing *Olin, supra*).

insurance policy interpretation. After concluding that the policies at issue in *Owens-Illinois* were ambiguous and that extrinsic evidence shed no real light on the ambiguity, *see* 138 N.J. at 468-70, the New Jersey Supreme Court, if it had been applying New York law, would have applied *contra proferentum* and resolved the ambiguity against the insurer.

Applying New Jersey law, the New Jersey Supreme Court set itself a far more ambitious task: "Our job, however, is not just to solve today's problems but to create incentives that will tend to minimize their recurrence." *Id.* at 473. Taking an unabashedly legislative approach, the court attempted to craft a "solution [that would] be an efficient response to the problem of insurance coverage for long-term environmental damage." *Id.* at 474. Balancing "public interest factors" such as the "efficient use of the resources available to cope with environmental disease or damage" and "principles of simple justice," *id.* at 471-73, the court transformed the interpretation of a contract of insurance into a discretionary matter to be largely delegated to a special master "skilled in the economics of insurance." *Id.* at 477.[12] Whether or not the *Owens-Illinois* court's approach may be proper under New Jersey law, that approach is the epitome of a court's reliance on its own "notions of abstract justice or moral obligation . . . in order to do raw equity" that this Court's precedents prohibit. *Breed,* 46 N.Y.2d at 355. In this State, "'it

---

[12] The court observed that insurers had considered, but not pursued, the possibility of drafting a policy that conferred discretion upon courts and directed them to do equity: "Almost wistfully, one of the [insurance industry] drafters acknowledged that at one time in the process, they sought a 'simple approach that would allow some latitude in each case for the courts to make an equitable decision on the facts.'" 138 N.J. at 469. In the present case, of course, no party has suggested that Con Edison's policies invite a court to exercise discretion or to do equity.

is not the function of the judiciary the change the obligations of a contract which the parties have seen fit to make.'" *Wallace,* 86 N.Y.2d at 548.

In sum, *Breed* and the numerous other precedents of this Court discussed herein prohibit a court from relying upon "equitable considerations" to *extend* coverage beyond the fair meaning of the policy. Because of the *contra proferentum* principle, it follows *a fortiori* that "equitable considerations" cannot justify a *reduction* of coverage inconsistent with a policy's language. The fact that the insurers in the present case have sought refuge in equity and public policy as a shield against the very language that they drafted powerfully highlights the error of their position. While considerations of public policy and equity may be relevant to the question of how indemnity costs should be allocated among insurers that have no contractual relationship, such considerations have no bearing on the interpretation of the bilateral contracts of insurance between an insured and its insurers. A duty to indemnify for "all sums" arising out of a covered occurrence means a duty to indemnify for "all sums" -- not "all sums" less some allocated amounts "calculated by the length of the chancellor's foot." *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.,* 906 F.2d 884, 891 (2d Cir. 1990) ("We concede without apology that we believe contract provisions specifying 60-day periods mean 60 days rather than 60 days plus an additional period calculated by the length of the chancellor's foot.") (applying New York law).[13]

---

[13] The policy language at issue in *Hercules, Inc.* was materially identical to that at issue here. *See* 784 A.2d at 490 (if an event resulted in damage during the policy period, it constituted an occurrence; policy obligated insurer to pay "all sums" incurred for damage arising out of the occurrence, not merely all sums incurred for damage occurring during policy period). The

## III.    EQUITY AND EFFICIENCY COUNSEL AGAINST JUDICIAL ADOPTION OF A PRO RATA ALLOCATED DUTY TO INDEMNIFY

For the reasons explained above, the only conceivable route to the conclusion that the duty to indemnify is pro rata under the policies at issue here is "raw equity" -- reliance on perceived notions of public policy as an escape hatch from ordinary rules of contract interpretation. New York law, however, does not create any such escape hatch. Under this Court's precedents, the duty to indemnify under the policies at issue here is indivisible because the policies make it so, and whether this Court believes that considerations of equity and efficiency favor or disfavor that result is beside the point.

While judicial conjuring of an escape hatch from ordinary doctrine would be improper even if done in an effort to avoid serious injustice, such an effort at least might be understandable. The Second Circuit seemingly believes that a pro rata duty to indemnify is so desirable that it should be imposed as a matter of public policy, for that court has offered no rationale other than public-policy-as-escape-hatch for its adoption of pro rata allocation.

Abex's experience, however, demonstrates powerfully that the Second Circuit and the New Jersey Supreme Court were mistaken in their predictions that truncating the

---

Delaware Supreme Court correctly "h[e]ld that pro rata allocation is inconsistent with the 'all sums' provisions in the policies." *Id.* at 489. Including *Hercules, Inc.,* the last three highest state courts to address this issue have agreed that the duty to indemnify is indivisible. *Accord Allstate Ins. Co. v. Dana Corp.,* 759 N.E.2d 1049, 1058 (Ind. 2001) ("By the policy's terms, once an accident or event resulting in Dana's liability -- an occurrence -- takes place within the policy period, Allstate must indemnify Dana for 'all sums' Dana must pay as a result of that occurrence, subject to policy limits."); *American Nat'l Fire Ins. Co. v. B & L Trucking and Constr. Co.,* 134 Wash.2d 413, 429, 951 P.2d 250, 256 (1998) ("We hold that once a policy is triggered, the policy language requires [the] insurer to pay all sums for which the insured becomes legally obligated, up to the policy limits.").

insurer's duty to indemnify "all sums" to a duty to indemnify only a pro rata share would be efficient and fair. In reality, the pro rata approach has been neither. Even if (contrary to fact) this Court were empowered to interpret Con Edison's policies to require or permit limiting the duty to indemnify to a pro rata share based on the Court's perceptions of fairness and efficiency, this Court should not do so.

In Abex's coverage action in federal district court, the allocation battles among Abex's seven primary insurers have strung out the litigation for two full decades. Some of these insurers have pursued efforts to "allocate" a portion of indemnity costs to Abex for periods during which Abex allegedly was "self-insured" or "under-insured," despite the fact that Abex's policies require the insurers to indemnify it for "all sums" that it is obligated to pay. While Abex has settled with some of its insurers, Abex still has not been made whole for all of the tens of millions of dollars that it has been obligated to pay as a consequence of the tens of thousands of asbestos claims filed against it. Delaying indemnity through two decades of "internecine struggle" among insurers defies description as either equitable or efficient.[14]

To its credit, the New Jersey Supreme Court promised in *Owens-Illinois* that if experience demonstrates that the "solution" fashioned by that decision "is inefficient or unrealistic, we will not hesitate to revisit the issue." 138 N.J. at 478. Abex respectfully submits that its experience and that of similarly-situated policyholders convincingly

---

[14] *See Asbestos Ins. Coverage Cases,* Judic. Council Coord. Proceeding No. 1072, Decision Concerning Phase IV Issues (Cal. Super. Ct. Jan. 24, 1990) at 41 (Brown, J.) ("The rights of the insureds to defense and indemnity should not be dependent upon . . . the 'internecine struggle' of the insurers over their respective share of liability.").

demonstrates that the indemnity regime created by *Owens-Illinois* and *Olin* is inequitable and inefficient. If this Court holds that the duty to indemnify under an "all sums" policy is indivisible, the unproductive internecine warfare among Abex's insurers will cease, and Abex at long last will receive the indemnification for which it purchased insurance.

Once Abex has been made whole by one or more of its insurers based on the terms of Abex's contracts of insurance, those insurers may seek contribution from other triggered policies based on principles of equity. *See Olin*, 221 F.3d at 322 (where the duty to indemnify is indivisible, "[t]he claim is paid under the policy that the insured selects. The insurer on that policy may then seek contribution from the issuers of any other triggered policies.").

Abex's 20-year ordeal is a lesson in the inefficiency of attempting to address simultaneously the contractual issues between the policyholder and its insurers and the equitable issues among the insurers. *Compare id.* at 323 (opining that "[a]llocation may also be more efficient because 'any contribution proceeding will involve many of the same issues that are raised in the initial liability proceeding, and . . . it is more efficient to deal with these issues in a single proceeding'") (quoting *Prudential,* 158 F.3d at 85). The Second Circuit's concern with avoiding "the burden of bringing a subsequent contribution action," *id.*, is misplaced. Where multiple policies are triggered, the insurers face the same fight among themselves over contribution whether they indemnify the policyholder before fighting with each other or afterward. Holding that an issuer of an "all sums" policy like those at issue here must make the policyholder whole (up to policy

limits) first rather than last grants no windfall to the policyholder, who has paid premiums in exchange for the insurer's promise to do just that.

In short, a pro rata allocated duty to indemnify is not only an improper attempt to use public policy to escape policy language -- it is bad public policy.

## CONCLUSION

For the reasons set forth above, amicus curiae Pneumo Abex Corporation respectfully requests that this Court reverse the Decision and Order of the Appellate Division, First Department, insofar as that court held that the insurance policies at issue limit a triggered policy's duty to indemnify to a pro rata share of Con Edison's damages.

Respectfully submitted,

KING & SPALDING

*Paul A. Straus*

Paul A. Straus
Danielle Sallah
1185 Avenue of the Americas
New York, NY 10036-4003
(212) 556-2100

Attorneys for Amicus Curiae
Pneumo Abex Corporation

*Of Counsel:*
Joseph W. Dorn
Jeffrey S. Bucholtz
M. Alexander Koch
1730 Pennsylvania Ave., N.W.
Washington, DC 20006
(202) 737-0500

Dated: February 12, 2002